Good morning, ladies and gentlemen. Our first case for this morning is Penrod v. Berryhill. Mr. Rodman. May it please the Court. My name is Jason Rodman and I represent the appellant, Leta Penrod, on behalf of Todd Penrod, deceased. I'm going to be stopping at three minutes to save time for rebuttal. This case is about a claimant with a heart condition, a kidney condition, a back condition, among other problems, including apparent and diagnosed psychological problems that appeared to be going downhill and he was not able to get treatment for. And I'm going to be showing, as I go through my points today, first that the administrative law judge decision shows or suggests that his impairments went uphill or at the very least stayed the same, but in fact they went downhill. Second, that his impairments in combination were not considered in the RFC, the residual functional capacity, the minimum amount that he's able to do. And finally, that the administrative law judge decision erred in its credibility analysis. And I would just ask you, as you do this, it's going to be helpful for me at least, if you focus on what the record shows as of his date last insured, because if these, I mean, obviously he passed away, which shows something, but if he had not reached the point that he couldn't have a job by the date last insured, the law says that you have to deny benefits. That's correct. And so the date last insured here is June 30, 2013. And there was an initial hearing that was on, I believe, April 11, 2012. For some reason, the administrative law judge skipped two days there and made the alleged onset date. That looked like a mistake, maybe just an inadvertent mistake. Maybe. But I'm not sure that it matters too much for what I'm asking about. As far as what happened between those two dates and leading up to those two dates, in January 2012, he had something going on apparently with his heart that led to hospitalization, or at least an emergency room visit. In April 2012, that seemed to happen twice. In November 2012, again. And there were citations or there were places in the record indicating that the symptoms occurred frequently, more frequently than that. It's not just the times he went to the emergency room. This is a gentleman who wanted to avoid costs at all. He went to extreme measures to avoid costs due to his financial situation and presumably the situation with his family. He, for example, had a stress test recommended multiple times he went to the ER, and he didn't have insurance, so he wasn't able to afford it. I think the cost for him, regardless of the cost of what it would be to do it, was something like $7,000, and that was a stress test, which is an important term that's going to come up in a subsequent argument. But the administrative law judge decision, if you compare the April 2012 one to the subsequent one, actually increases the time that supposedly he can stand by about two hours. That's perhaps the most notable thing. And yet, based on his testimony under oath and his impairments in combination, he had quite a bit of fatigue and chest pain. So it doesn't really seem plausible once you consider that his impairments in combination seem to go downhill. I thought the administrative law judge also said that Mr. Penrod, he needs the option to sit or stand at will. Doesn't that seem to negate the point you just made about the increase rather than the decrease or holding it the same? The point I think you're making is that it might be debatable in terms of the reservations in the prior opinion for the additional three to five minute breaks that they included. But in terms of the total time standing over the course of a day, Penrod proposes today and in the briefing that that is a distinctly different matter. Even though the ALJ said that he can sit or stand at will and he needs that option? Well, it has to do, it comes down, in the final analysis, it comes down to the specific jobs he's able to do. And the administrative law judge decision says that he could stand six of eight, stand or walk six of eight hours in the subsequent administrative law judge decision, whereas it was maximum half the day in the first one. So that's showing as if things improved and things did not. And in terms of the kidney stones, for example, there was a stone removed and then he had a heart thing and so it didn't get removed and so he seemed to live with it. And that pain in the kidneys is, I think, somewhere next to the back. And so in terms of the pain, I think that adds to the credibility. I think the point you're trying to make, and of course an administrative law judge does need to provide a window into the reasoning to see why the judge may have thought that the RFC was actually a little better than it had been recorded to be last time, doesn't necessarily mean that he was wedded to the earlier one. He just has to have a reason. He's looking at these various medical assessments, right? I think you're right that there needs to be a logic to it. And other than that, I don't disagree with the way you presented that, Your Honor. Looking at the time, I'm going to conflate the two final arguments a little bit for simplicity, which is the psychological examiner, Dr. Male, examined him and said he had significant mood and behavioral instability. Now granted, this was July 2013, the month after that date last insured, which you pointed out accurately is an important legal matter. But, and I'm going to finish a few sentences here if that's okay. Sure. But the administrative law judge decision says that they're not giving it any significant weight because there's no, quote, unquote, no evidence of severe mental limitations before. However, that approach ignores the entire line of contrary evidence connected to the heart conditions and the lack of a stress test, even though it was recommended. And those things, and for these reasons, we ask for a remand, and I'd like to reserve my time for rebuttal. That would be fine. Thank you. Ms. Schwartz. Good morning. Good morning. May it please the court, I'm Allison Schwartz, and I represent the acting commissioner. She's actually the deputy commissioner now, right? Recently she was named the acting commissioner back again. Back up to the acting commissioner title? So she went from acting to deputy back to acting. All right. So here, I know, it's a little crazy. So here's my problem with this case. You know, on the one hand, there are all these different doctors and things, but you look at this guy's history, he clearly has very significant heart problems. People who are having to pop nitroglycerin all the time are not people with a healthy heart. Stress is particularly troublesome. And the acting commissioner is in the awkward position of saying this man who dropped dead two months after the hearing was just fine and could work as of June 29, 2013. And it seems to require quite an exercise in mental gymnastics to get there. Your Honor, I would like to clarify, Mr. Penrod died almost two years after the expiration of his date last insured.  At which point the judge is assessing all of this stuff. And even before the date last insured, he has quite a few cardiac incidents in which the administrative law judge rather casually is saying, oh, well, but he was fine, he took a second nitroglycerin pill. Most people don't go around needing to take nitroglycerin just to make it through the day. Well, as pointed out in my brief, the Mayo Clinic has said that nitroglycerin pills are frequently used to treat angina symptoms. And that an individual doesn't need to go to the emergency room unless they've taken three nitroglycerin pills. I'm not sure that that would be universally accepted health advice. I have seen other health advice that suggests if you're experiencing the kind of symptoms of a mitocardial infarction that he was, you go to the emergency room because time is of the essence. Well, if you look at the... Oh, well, let's try one more nitroglycerin pill. Well, to remind the Court, this just deals with the snapshot in time from April 2002 through June of 2013. Right, through June 30th. Well, we need to find the onset by June 30th, right? By the date last insured. By the date last insured, absolutely. Mr. Penrod actually only went to the emergency room for those symptoms one time. He did go one time earlier, but it was only because he did not have nitroglycerin pills. The nitroglycerin pills that he had were old. So, yes, he did have to go to the emergency room once because he took two nitroglycerin pills. If you look at the... Well, he has heart symptoms twice, though. He doesn't have the right pills. He did have heart symptoms twice, but he didn't have the medication the first time. Right. He's one of these people who doesn't seem to have enough money to take care of himself health-wise. So he... I would say, at a minimum, the law is that you can't draw an adverse inference against somebody for that. No, and I don't believe the ALJ did in this case. The ALJ looked at the evidence in the record and acknowledged that there was certain treatment that Mr. Penrod could not afford, yet determined that based on the medical evidence that was in the record, which included a very lengthy treatment note from his cardiologist, there was enough evidence to prove that he only suffered from intermittent chest pain, which was what the medical record, what Mr. Penrod's cardiologist mentioned multiple times in the treatment notes. And Mr. Penrod himself reported that his symptoms were typically relieved either with one nitroglycerin pill or went away on their own. So I don't... Is there any evidence in the record about the correlation between people who have these initial symptoms and those who, like Mr. Penrod, then have the big one, the big heart attack? I mean, surely he's at higher risk than the general population for a heart attack. Sure, and the ALJ acknowledged that his coronary artery disease was severe and that he did have a heart attack more than a year and a half after the expiration of his date last insured. The hearing, which was at the end of 2014, was also after the expiration of his date last insured. And while there is sympathy for this individual, the ALJ is bound by the snapshot in time. You know, if Mr. Penrod was not disabled by June 30, 2013, the ALJ can't grant him disability regardless of what happens at the end of 2014. That's the law. But the question is, sometimes you get medical evidence and it's not the type of condition that just wasn't there one day and springs into being the next day. You can extrapolate backwards. You can say this has been building. The coronary artery disease obviously had been... Mr. Penrod was not a healthy man. He was going to have triple bypass surgery, wasn't he? That was in 2010, and that was covered by a previous... Actually, he had triple bypass surgery in 2014. Fourteen. Yes, which was, again, well after the expiration of his date last insured, which is unfortunate. But the condition that leads to the need for triple bypass surgery, I'm saying it's not like one day you're healthy and the next day you go in and see your cardiologist who says, Oh, let's do triple bypass surgery. Sure. There's a period of time in which the need for it builds up. Right, and I think that what you are saying is that the ALJ would have to look and see whether or not this evidence related back to the period. And the ALJ made that evaluation there and determined that it didn't relate back. Where do you see that in her opinion? Where do you see the effort to relate back? She says at the bottom of page 10 of 14, consistent complaints of intermittent chest pain, no question the heart disease progressed over time, eventually became very serious in September 2014. Yes. The evidence on and before June 30. So that makes me wonder, is she looking at the evidence after June 30 and asking the question that we're discussing? Does it relate back? Well, the evidence as of June 30, 2013, has to contain some sort of suggestion that it would relate forward. And if you look at the medical evidence during that period, in fact, during one of Mr. Penrod's appointments with his cardiologist, his cardiologist said he's doing well from a cardiovascular standpoint. And this is not to say that he doesn't have symptoms. The ALJ acknowledged that he did have symptoms. And the record shows that building up to June 30, it's not like we're wondering whether he has a neurological disorder. We see that he has a cardiac problem and he's taking nitroglycerin from time to time. Again, all of this discussion at the bottom of page 10. So I'm just wondering, did the ALJ take the post-June 30 evidence and ask, does this shed light on what was happening before June 30? I think that the passage that you just read creates a reasonable inference that, yes, the ALJ considered the evidence as a whole and did not find that it related back. In fact, the ALJ looked at it. I just don't read that sentence that way. I'm sorry. And if you look further, the ALJ considers Mr. Penrod's activities at the hearing and said, well, his activities at the hearing seem to relate to 2014 when his condition got worse, but I just don't see anything in the record showing that this relates back to 2013. And she articulates that in her decision. And, you know, it's a very significant period of time. It's a very short period of time that's covered in the ALJ's decision. And one more thing that I just quickly wanted to add. I know I'm getting close to being out of time. You had mentioned that the ALJ would need to explain the basis for her residual functional capacity assessment, which is the most a claimant can do despite his limitations. And in this case, the ALJ's residual functional capacity assessment, or RFC as we typically call it, tracks the state agency doctor's opinions to doctors who reviewed and summarized the medical evidence in the record during that time period and found that Mr. Penrod had the ability to perform light work with the restrictions set forth in the RFC. And to the extent that the ALJ added additional limitations, she explained the basis for those. So if the court does not have any further questions, I request that the court affirm the ALJ's decision. All right. Thank you very much. Thank you. Anything further, Mr. Rodman? Briefly, Your Honor. I guess I would answer first. It seems like Mr. Penrod was doing well for someone who cannot afford the recommended stress test and sometimes not even blood thinners and seems to have some kind of stress-psychological thing going on such that it would not be a proper basis to diminish his credibility for the sake of noncompliance. Well, the problem with the lack of a stress test is it just deprives everybody, the ALJ, the administration, the court of information about what his condition really was. Had he had the stress test, maybe it would have clarified it one way, maybe it would have clarified it the other way. I think that's right. I will note that in terms of the appointments and the times he had things that triggered the emergency room, those things would be referenced in the opening appellant brief and did seem to be simplified, condensed a bit by the administrative law judge decision, at the very least condensed if not leaving things out explicitly. And it also strikes me as listening to the argument today that the sit-stand limitation might be something that's less onerous for a back condition but more onerous for someone with a heart condition with such fatigue symptoms as Mr. Penrod dealt with. I don't believe there was a significant event between the hearing and his death. Things seem to become an emergency situation more so than they were even September 2014 before the February 2015 death. It is important in terms of that date last insured, which comes back to the importance of those psychological symptoms for the sake of Penrod's argument today. And I guess I would reference the Arnett case and the Kastner case, bring extra attention to those if I may finish my thought. And in that, the entire line of stress concerns with the, I think you would agree, ambivalent record at least, suggest that a full explanation and exploration has not been made and thus we ask to remand. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement.